IN THE UNITED STATES DISTRICT COURT **FILED**
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

JUN 1 7 2002

**LARRY W. PROPES, CLERK**
**COLUMBIA, S.C.**

| | |
|---|---|
| The DEPARTMENT OF ENERGY and SPENCER ABRAHAM, Secretary of Energy,<br><br>Plaintiffs,<br>v.<br><br>JIM HODGES, Governor of South Carolina,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

1 05 2078 22

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

TO THE HONORABLE COURT:

COME NOW the plaintiffs, the Department of Energy and Spencer Abraham, the Secretary of Energy, represented by their undersigned counsel, and very respectfully state and pray as follows:

### Nature of the Action

1. This is a civil action to enjoin the defendant, and any person or entity acting in concert or participation with him, from preventing the shipment of surplus plutonium by the Department of Energy to any federal facility in South Carolina. Defendant's actions to prevent these shipments violate the Supremacy Clause and the Commerce Clause of the United States Constitution.

2. The Governor of South Carolina ("Governor") has decided to use physical means, if necessary, to stop the Department of Energy's planned shipments of surplus federal plutonium into South Carolina. On June 14, 2002, the Governor issued an Executive Order purporting to prohibit the transportation of plutonium on the highways of South Carolina, and directing enforcement of that prohibition by the South Carolina Department of Public Safety (which

*ORDL. #1*

*1.*

includes the South Carolina Highway Patrol). Plaintiffs, the Department of Energy and Spencer Abraham, the Secretary of Energy, seek an injunction against any attempt by the Governor, or by any person or entity acting in concert or participation with him, to carry out his decision to stop the Department of Energy's shipments of plutonium by physical means, or to enforce the Executive Order in relation to the plaintiffs or their officers or employees.

### Jurisdiction and Venue

3. This action arises under the Constitution of the United States, Article I, Section 8, Clause 3 (Commerce Clause); Article I, Section 8, Clauses 11, 12, 13, and 14 (war and armed forces); Article II, Section 2, Clause 1 (Commander in Chief); Article II, Section 2, Clause 2 (foreign relations); Article II, Section 3, Clause 3 (foreign relations); Article IV, Section 3, Clause 2 (Property Clause); and Article VI, Clause 2 (Supremacy Clause). It also arises under the Atomic Energy Act of 1954 ("AEA"), 42 U.S.C. §§ 2011, et seq., and regulations adopted thereunder; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq.

4. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1345 (United States as plaintiff).

5. Venue lies in the District of South Carolina under 28 U.S.C. § 1391(b), in that the action arises within this District and the defendant resides in this District.

### Parties

6. Plaintiff, the Department of Energy ("DOE") is an executive department of the United States having overall statutory responsibility for the Nation's nuclear defense programs, domestic energy programs, radioactive-waste programs, and energy research and development programs.

7. Plaintiff, Spencer Abraham, the Secretary of Energy, is the head of the Department of Energy, and is responsible for its overall supervision and direction.

AROA. #2

8. Defendant, Jim Hodges, is the Governor of the State of South Carolina. He is sued in his official capacity.

### Factual Allegations

**I.     Authority of the Department of Energy**

9. Among its duties, the Department of Energy is statutorily responsible for the integrity and safety of the Nation's nuclear weapons, and for the management, processing, and disposition of nuclear materials. 42 U.S.C. §§ 7112, 7132, 7133, 7274m, 7274n, 7274p; 50 U.S.C. § 2341.

10. The end of the Cold War has created a legacy of surplus plutonium from nuclear weapons, which must be either stored or disposed of. DOE has immediate responsibility for the management, processing, and disposition of that surplus plutonium.

11. DOE is working to modify its system for managing, processing, and disposing of surplus weapon-grade plutonium, in order to reduce costs, expedite closure and cleanup of certain sites and facilities in its nuclear complex, and enhance the security of this plutonium.

**II.     The U.S.-Russia Agreement on Disposition of Plutonium**

12. In September 2000, the United States and the Russian Federation entered into a reciprocal agreement to dispose of certain weapon-grade plutonium ("U.S-Russia Agreement"). A copy of the U.S.-Russia Agreement is attached hereto as Exhibit A.

13. In the U.S.-Russia Agreement, the United States and the Russian Federation each committed to dispose of no less than thirty-four (34) metric tons of plutonium (Article I, paragraph 1).

14. The Department of Energy is responsible for carrying out the commitments of the United States, under the U.S.-Russia Agreement, to dispose of certain weapon-grade plutonium.

AA #3

15. Carrying out the commitments of the United States under the U.S.-Russia Agreement will entail transporting certain weapon-grade plutonium from various locations within the United States to other locations within the United States, including across state lines.

**III.     Transfer of Plutonium to the Savannah River Site**

16. The Savannah River Site ("SRS") is a DOE facility located within South Carolina. The facility occupies approximately 310 square miles.

17. At SRS, the Department of Energy carries out many of its responsibilities for the production, management, and disposition of nuclear materials, including plutonium.  SRS houses extensive facilities for the production, management, and disposition of nuclear materials.

18. Approximately two metric tons of plutonium are already stored at SRS.

19. In furtherance of the commitments of the United States under the U.S.-Russia Agreement, DOE's strategy includes possible construction of a facility at SRS to convert weapon-grade plutonium to mixed uranium oxide-plutonium oxide ("MOX"), which can be used as fuel in nuclear reactors.

20. Both to improve its system for managing, processing, and disposing of surplus weapon-grade plutonium, and in anticipation of possible construction of the MOX conversion facility, DOE intends to transport a portion of the nation's surplus plutonium to SRS.  DOE is engaging in further environmental analysis under the National Environmental Policy Act before making a final decision whether to construct the MOX facility at SRS.

21. The shipment of this plutonium to SRS is currently scheduled to begin on or after June 22, 2002.

22. The vehicles to be used in DOE's shipment of plutonium to SRS are owned by the United States, and the personnel who conduct every such shipment are federal officers.

RFP # 4

23. The DOE vehicles used in its shipments of plutonium, known as Safe, Secure Trailers and Safe Guard Transporters, are specially designed eighteen-wheel tractor-trailers with reinforced cargo features. The SSTs are built by private commercial entities under contract with DOE.

24. The shipment of plutonium is to be carried out pursuant to stringent federal guidelines and procedures designed for safe passage.

25. Private commercial entities perform various functions at SRS under contract with DOE, and certain of those entities will be involved in managing and processing the surplus plutonium that DOE intends to ship to SRS.

## IV.    Actions of Governor Hodges

26. Defendant Jim Hodges, currently the Governor of South Carolina ("Governor"), has stated publicly that he has decided to use physical means, if necessary, to stop DOE's planned shipment of surplus plutonium into South Carolina, including by blockading any roadway used for any such shipment with the assistance of the South Carolina Highway Patrol.

27. On April 22, 2002, upon the request and under the personal observation of the Governor, officers and state troopers of the South Carolina Highway Patrol, and other State employees, rehearsed an attempt to stop DOE's planned shipments of plutonium, by setting up a roadblock across a highway entering the State.

28. The Governor's pages on the State's web site include photographs of the April 22 rehearsal, under the heading "Governor Prepares for Plutonium Shipments," followed by the date "April 22, 2002" (http://www.state.sc.us/governor/photos.html). The caption under one of those photographs states, "Governor Hodges, Col. Mike Kelly, and Boykin Rose review plan to turn back trucks carrying Plutonium."

RPH. #5

29. The Governor has also authorized a television advertisement which states that he intends to stop DOE's planned shipment of surplus plutonium into South Carolina, "even if it means a blockade." The advertisement, which has been broadcast under the Governor's authorization several times during the month of May 2002, includes one or more images of the April 22 rehearsal.

**V.    The Governor's Lawsuit and Later Actions**

30. On May 1, 2002, the Governor filed suit in this Court against DOE and the Secretary of Energy, alleging that DOE's planned shipment of surplus plutonium to SRS violated the National Environmental Policy Act and seeking an injunction against such shipment. Jim Hodges v. Spencer Abraham, et al., Civil Action No. 1:02-1426-22 (D.S.C.) ("Hodges v. Abraham").

31. On May 8, 2002, counsel for the Department of Energy wrote to counsel for the Governor, asking whether the Governor would obstruct or impede the shipment of any surplus plutonium to SRS if this Court were to deny the Governor's motion for a preliminary injunction in Hodges v. Abraham.

32. In response to the May 8 letter of counsel for DOE, counsel for the Governor stated, in a letter dated May 10, 2002:

> Unless a legally enforceable agreement is in place requiring the Department of Energy to convert and/or remove any plutonium shipped to South Carolina, the Governor expressly reserves the right to rely upon any and all lawful means available to him in his capacity, and under his authority, as the Governor of the State of South Carolina to prevent the Department of Energy from shipping any surplus plutonium to South Carolina.

RFOA # 6

33. The May 10 letter of counsel for the Governor did not state that the Governor would refrain from attempting to stop the shipment of plutonium to SRS, including by the use of physical means, if this Court were to deny the Governor's motion for a preliminary injunction.

34. On June 13, 2002, this Court entered judgment against the Governor and in favor of DOE in Hodges v. Abraham, rejecting the Governor's contention that DOE's planned shipments of plutonium to SRS were in violation of the National Environmental Policy Act.

35. While entering judgment for DOE in Hodges v. Abraham, this Court denied, as premature, the defendants' motion for summary judgment on their counterclaim in that action, which had sought a declaratory judgment stating that any attempt by the Governor, or by any person or entity acting in concert or participation with him, to stop DOE's shipments of surplus plutonium into South Carolina using physical means, or to interfere with the shipments in any other way, would be unconstitutional and preempted by federal law.

36. On June 13, 2002, the Governor appealed this Court's judgment in Hodges v. Abraham, and filed, in the United States Court of Appeals for the Fourth Circuit, a motion for an injunction pending appeal.

37. On June 14, 2002, the Governor issued Executive Order 2002-14 ("Executive Order"), in which he purports to prohibit the transportation of plutonium on the highways of South Carolina, and directs the South Carolina Department of Public Safety to enforce that prohibition. A copy of the Executive Order is attached hereto as Exhibit B.

38. The Executive Order makes no exception for the transportation of plutonium by the United States, and, in fact, notes that "the United States Department of Energy has publicly announced that it will begin sending truck shipments of weapons-grade plutonium to the

RF0/ # 7

Savannah River Site located in Aiken and Barnwell Counties, South Carolina as soon as June 15, 2002."

39. Executive Order 2002-14 directs the South Carolina Department of Public Safety, including its component the South Carolina Highway Patrol, to stop shipments of plutonium by the plaintiffs and their officers and employees, without any further directive or authorization by the Governor.

40. On June 14, 2002, the Governor issued a media statement announcing the Executive Order ("media statement"). A copy of the media statement is attached hereto as Exhibit C.

41. In the media statement, the Governor said, among other things, "The Department of Energy has made its intentions clear. They plan to ship plutonium over our highways and into our state. . . . These actions by the Department of Energy pose an immediate hazard, and threaten the long term health and safety of our state. . . . I order that the transportation of plutonium on South Carolina roads and highways is prohibited. I order that persons transporting plutonium shall not enter the State of South Carolina."

42. The Governor's decision to stop DOE's planned shipments of surplus plutonium into South Carolina using physical means is based on his contentions regarding the health and safety hazards of radiation.

43. Any attempt to carry out the Governor's decision to stop DOE's shipment of plutonium would constitute unauthorized interference with the performance of a federal function.

44. Any use of physical means by the Governor, or by any person or entity acting in concert or participation with him, to attempt to stop any shipment of plutonium by the United States would, at a minimum, delay the progress of that shipment.

RROA. # 8

45. Any unplanned delay during a shipment of plutonium would create a risk of harm to the public, to the DOE personnel conducting the shipment, and to any persons responsible for the delay.

46. Any unplanned delay during a shipment of plutonium would provide an opportunity for other persons or entities, not associated with the Governor, to attempt to waylay or damage the federal vehicles, to extract or seize the plutonium contained therein, and otherwise to disrupt the shipment.

## Causes of Action

### I.    Federal Immunity Against State Interference

47. Paragraphs 1 through 46 above are incorporated herein as if set forth in full.

48. The shipment of surplus plutonium by the Department of Energy, to the Savannah River Site in South Carolina, constitutes an activity of the United States authorized by the Atomic Energy Act and other federal statutes.

49. The Governor has repeatedly expressed his intent to stop DOE's shipment of surplus plutonium to SRS, using physical means.

50. The Governor has taken several affirmative steps toward carrying out his decision to stop DOE's shipment of plutonium using physical means, including the issuance of Executive Order 2002-14.

51. Any attempt by the Governor, or by any person or entity acting in concert or participation with him, to stop the shipment of plutonium by the United States using physical means would interfere with the performance of lawful federal activities by federal officials, and would, therefore, violate Article VI, Section 2, of the United States Constitution (the Supremacy Clause).

RFOA #9

52. Executive Order 2002-14, as applied to the shipment of plutonium by the plaintiffs or their officers or employees, violates Article VI, Section 2, of the United States Constitution (the Supremacy Clause).

## II.    Preemption by Virtue of the Atomic Energy Act

53. Paragraphs 1 through 52 above are incorporated herein as if set forth in full.

54. With certain minor and irrelevant exceptions, the Atomic Energy Act, 42 U.S.C. §§ 2011, et seq., establishes exclusive federal jurisdiction over the possession, control, and shipment of plutonium.

55. Any attempt by the Governor to stop the Department of Energy's shipment of surplus plutonium into South Carolina, using physical means, would interfere with the federal government's exclusive jurisdiction over the possession, control, and shipment of plutonium. Any such attempt would injure the United States in the exclusive exercise of its authority pursuant to the Atomic Energy Act.

56. Any attempt by the Governor to stop the Department of Energy's shipment of surplus plutonium into South Carolina, using physical means, would be preempted by the Atomic Energy Act and would, therefore, be unconstitutional under the Supremacy Clause of the United States Constitution.

57. Executive Order 2002-14 purports to prohibit activity by the plaintiffs which is permitted by the Atomic Energy Act, and, therefore, is unconstitutional under the Supremacy Clause of the United States Constitution.

## III.    Interstate Commerce

58. Paragraphs 1 through 57 above are incorporated herein as if set forth in full.

RFOJ. #10

59. The power to regulate interstate commerce is reserved to the federal government by Article I, Section 8, Clause 3 of the United States Constitution (the Commerce Clause).

60. The shipment of surplus plutonium into South Carolina constitutes interstate commerce.

61. Any attempt by the Governor to stop the Department of Energy's shipment of surplus plutonium into South Carolina, using physical means, would discriminate against interstate commerce.

62. Any attempt by the Governor to stop the Department of Energy's shipment of surplus plutonium into South Carolina, using physical means, would unduly burden interstate commerce by:

(a)    prohibiting the shipment of surplus plutonium to and within South Carolina;

(b)    preventing the United States from processing surplus plutonium at its Savannah River Site; and

(c)    restricting the United States' ability to work with surplus plutonium within the State of South Carolina.

63. The United States would be injured by the Governor's discrimination against, and undue burdens upon, interstate commerce.

64. Any attempt by the Governor to stop the Department of Energy's shipment of surplus plutonium into South Carolina, using physical means, would violate the Commerce Clause of the United States Constitution.

65. Executive Order 2002-14 purports to prohibit "any persons transporting plutonium" from "enter[ing] the State of South Carolina," and, therefore, violates the Commerce Clause of the United States Constitution.  The Executive Order also violates the Commerce Clause insofar



as it purports to prohibit the transportation, within South Carolina, of plutonium moving in interstate commerce.

## REQUEST FOR RELIEF

WHEREFORE, plaintiffs, the Department of Energy and Spencer Abraham, the Secretary of Energy, respectfully pray that the Court:

(1) Declare that any attempt by the Governor of South Carolina, or by any person or entity acting in concert or participation with him, to stop the Department of Energy's shipments of surplus federal plutonium into South Carolina using physical means, or to interfere with the shipments in any other way, would be unconstitutional and preempted by federal law;

(2) Declare that Executive Order 2002-14, issued by Governor Hodges on June 14, 2002, is unconstitutional as applied to the plaintiffs or their officers or employees and preempted by federal law;

(3) Preliminarily and permanently enjoin the Governor, his successor, and any person or entity acting in concert or participation with him, including the South Carolina Department of Public Safety and the South Carolina Highway Patrol, from stopping or attempting to stop the Department of Energy's shipments of surplus federal plutonium into South Carolina using physical means, and from interfering with the shipments in any other way;

(4) Assess the costs of this litigation against the defendant; and

(5) Grant plaintiffs such other relief as the Court deems just and proper.

RFDJ. # 12

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

J. STROM THURMOND
United States Attorney

SHANNEN W. COFFIN
Deputy Assistant Attorney General

ROBERT F. DALEY, JR. (#6460)
CHRISTIE NEWMAN BARRETT (#5473)
Assistant United States Attorneys
1441 Main Street, Suite 500
Columbia, South Carolina 29201
Telephone: (803) 929-3054

JOSEPH H. HUNT
Branch Director

ARTHUR R. GOLDBERG
Assistant Director

OF COUNSEL:
MARC JOHNSTON
   Deputy General Counsel for Litigation
STEVEN E. FERGUSON
   Supervisory Attorney-Adviser
JANET MASTERS
   Trial Attorney
STEPHEN A. DOVE
   General Attorney
U.S. DEPARTMENT OF ENERGY

W. SCOTT SIMPSON

Attorneys, Department of Justice
Federal Programs Branch
Civil Division, Room 986
Post Office Box 883
Washington, D.C. 20044
Telephone: (202) 514-3495
      Fax: (202) 616-8202

COUNSEL FOR PLAINTIFFS

Dated:  June 17, 2002

RFDJ. #13

# AGREEMENT
## BETWEEN
## THE GOVERNMENT OF THE UNITED STATES OF AMERICA
## AND
## THE GOVERNMENT OF THE RUSSIAN FEDERATION
## CONCERNING THE MANAGEMENT AND DISPOSITION
## OF PLUTONIUM DESIGNATED AS NO LONGER REQUIRED
## FOR DEFENSE PURPOSES AND RELATED COOPERATION

The Government of the United States of America and the Government of the Russian Federation, hereinafter referred to as the Parties,

Guided by:

The Joint Statement of Principles for Management and Disposition of Plutonium Designated as No Longer Required for Defense Purposes, signed by the President of the United States of America and the President of the Russian Federation on September 2, 1998, affirming the intention of each country to remove by stages approximately 50 metric tons of plutonium from their nuclear weapons programs and to convert this plutonium into forms unusable for nuclear weapons;

Taking into account:

The Agreement between the Government of the United States of America and the Government of the Russian Federation on Scientific and Technical Cooperation in the Management of Plutonium That Has Been Withdrawn from Nuclear Military Programs, signed on July 24, 1998 (hereinafter referred to as the Scientific and Technical Cooperation Agreement);

Continuation by the Parties of their cooperation within the framework of the Scientific and Technical Cooperation Agreement and the importance of that work for making decisions concerning technologies for plutonium conversion and mixed uranium-plutonium fuel fabrication, as well as for reactor modification for the use of such fuel;

The statement of the President of the United States of America on March 1, 1995, announcing that 200 tons of fissile material will be withdrawn from the U.S. nuclear stockpile and directing that these materials will never again be used to build a nuclear weapon;

The statement of the President of the Russian Federation to the 41st Session of the General Conference of the International Atomic Energy Agency, on September 26, 1997, on step-by-step removal from nuclear military programs of up to 500 tons of highly enriched uranium and up to 50 tons of plutonium released in the process of nuclear disarmament; and

The Joint Statement by the Parties concerning non-separation of weapon-grade plutonium in connection with the signing of this Agreement;

Have agreed as follows:



# AGREEMENT
## BETWEEN
### THE GOVERNMENT OF THE UNITED STATES OF AMERICA
### AND
### THE GOVERNMENT OF THE RUSSIAN FEDERATION
### CONCERNING THE MANAGEMENT AND DISPOSITION
### OF PLUTONIUM DESIGNATED AS NO LONGER REQUIRED
### FOR DEFENSE PURPOSES AND RELATED COOPERATION

The Government of the United States of America and the Government of the Russian Federation, hereinafter referred to as the Parties,

Guided by:

The Joint Statement of Principles for Management and Disposition of Plutonium Designated as No Longer Required for Defense Purposes, signed by the President of the United States of America and the President of the Russian Federation on September 2, 1998, affirming the intention of each country to remove by stages approximately 50 metric tons of plutonium from their nuclear weapons programs and to convert this plutonium into forms unusable for nuclear weapons;

Taking into account:

The Agreement between the Government of the United States of America and the Government of the Russian Federation on Scientific and Technical Cooperation in the Management of Plutonium That Has Been Withdrawn from Nuclear Military Programs, signed on July 24, 1998 (hereinafter referred to as the Scientific and Technical Cooperation Agreement);

Continuation by the Parties of their cooperation within the framework of the Scientific and Technical Cooperation Agreement and the importance of that work for making decisions concerning technologies for plutonium conversion and mixed uranium-plutonium fuel fabrication, as well as for reactor modification for the use of such fuel;

The statement of the President of the United States of America on March 1, 1995, announcing that 200 tons of fissile material will be withdrawn from the U.S. nuclear stockpile and directing that these materials will never again be used to build a nuclear weapon;

The statement of the President of the Russian Federation to the 41st Session of the General Conference of the International Atomic Energy Agency, on September 26, 1997, on step-by-step removal from nuclear military programs of up to 500 tons of highly enriched uranium and up to 50 tons of plutonium released in the process of nuclear disarmament; and

The Joint Statement by the Parties concerning non-separation of weapon-grade plutonium in connection with the signing of this Agreement;

Have agreed as follows:

– 2 –

### Article I

For the purposes of this Agreement, the terms specified below are defined as follows:

1. "Weapon-grade plutonium" means plutonium with an isotopic ratio of plutonium 240 to plutonium 239 of no more than 0.10.

2. "Disposition plutonium" means weapon-grade plutonium that has been

   a) withdrawn from nuclear weapon programs,

   b) designated as no longer required for defense purposes, and

   c) declared in the Annex on Quantities, Forms, Locations, and Methods of Disposition, which is an integral part of this Agreement.

3. "Blend stock" means any plutonium other than disposition plutonium that is received at a disposition facility for mixing with disposition plutonium.

4. "Spent plutonium fuel" means fuel that was manufactured with disposition plutonium and irradiated in nuclear reactors.

5. "Immobilized forms" means disposition plutonium that has been imbedded in a glass or ceramic matrix and encapsulated with high-level radioactive waste in a can-in-canister system suitable for geologic disposal, or any other immobilization system agreed in writing by the Parties.

6. "Disposition facility" means any facility that is constructed, modified or operated under this Agreement or that stores, processes, or otherwise uses disposition plutonium, spent plutonium fuel, or immobilized forms, including any such conversion or conversion/blending facility, fuel fabrication facility, immobilization facility, nuclear reactor, and storage facility (other than storage facilities specified in Section III of the Annex on Quantities, Forms, Locations, and Methods of Disposition).

### Article II

1. Each Party shall, in accordance with the terms of this Agreement, dispose of no less than thirty-four (34) metric tons of disposition plutonium.

2. Each Party's declaration on quantities, forms, locations, and methods of disposition for disposition plutonium is set forth in the Annex on Quantities, Forms, Locations, and Methods of Disposition.

3. The Parties shall cooperate in the management and disposition of disposition plutonium, implementing their respective disposition programs in parallel to the extent practicable.

4. The reciprocal obligations set forth in paragraph 1 of this Article shall not prejudice consideration by the Parties of what additional quantities of plutonium may be designated by each Party in the future as no longer required for defense purposes.

– 3 –

5. The Parties shall cooperate with a view to ensuring that additional quantities of weapon-grade plutonium that may be withdrawn from nuclear weapon programs and designated in the future by the Parties as no longer required for defense purposes are:

a) brought under and disposed of in accordance with the terms of this Agreement; or

b) subject to other measures as agreed by the Parties in writing that provide for comparable transparency and disposition.

6. Each Party shall have the right to mix blend stock with disposition plutonium provided that for nuclear reactor fuel containing disposition plutonium the mass of blend stock shall:

a) be kept to a minimum, taking into account the protection of classified information, safety and economic considerations, and obligations of this Agreement; and

b) in no case exceed twelve (12) percent of the mass of disposition plutonium with which it is mixed.

The resulting mixture of disposition plutonium and blend stock shall be weapon-grade plutonium.

7. Each Party's disposition plutonium shall count toward meeting the thirty-four (34) metric ton obligation set forth in paragraph 1 of this Article once the other Party confirms in accordance with agreed procedures that the spent plutonium fuel or immobilized forms meet the criteria specified in the Annex on Technical Specifications, which is an integral part of this Agreement. Blend stock shall not count toward meeting that thirty-four (34) metric ton obligation.

**Article III**

1. Disposition shall be by one or more of the following methods:

a) irradiation of disposition plutonium as fuel in nuclear reactors;

b) immobilization of disposition plutonium into immobilized forms; or

c) any other methods that may be agreed by the Parties in writing.

2. The following are the nuclear reactors that may be used for irradiation of disposition plutonium under this Agreement: light water reactors in the United States of America and in the Russian Federation; the BOR-60 at Dimitrovgrad and the BN-600 at Zarechnyy in the Russian Federation; and any other nuclear reactors agreed by the Parties in writing.

**Article IV**

1. Each Party shall take all reasonable steps, including completion of necessary technical and other preparatory activities and feasibility studies, to complete construction and modification and to begin operation of disposition facilities necessary to dispose of no less than two (2) metric tons per year of its disposition plutonium in accordance with

– 4 –

Article III of this Agreement, if the assistance specified in the multilateral agreement referred to in paragraph 8 of Article IX of this Agreement for this disposition rate is being provided for achievement of milestones in the Russian Federation specified in the Annex on Schedules and Milestones, which is an integral part of this Agreement.

2. Each Party shall seek to begin operation of facilities referenced in paragraph 1 of this Article not later than December 31, 2007.

3. Pending conclusion of the multilateral agreement referred to in paragraph 8 of Article IX of this Agreement for the disposition rate specified in paragraph 1 of this Article, the Parties shall proceed with research, development, demonstrations, design and licensing activities under this Agreement, on the condition that assistance for such activities is being provided pursuant to paragraph 1 of Article IX of this Agreement.

4. Each Party shall notify the other Party whenever it reaches a milestone set forth in the Annex on Schedules and Milestones or, if not reached at the specified time, the reasons for that delay. If a Party does not reach a milestone at the specified time, it shall make every effort to minimize the delay. In these circumstances, the Parties shall establish in writing a revised mutually-agreed schedule of work for achieving the milestone.

5. Once facilities specified in paragraph 1 of this Article are constructed or modified and begin operations, each Party shall proceed to dispose of disposition plutonium to achieve a disposition rate of no less than two (2) metric tons per year at the earliest possible date.

6. If, prior to December 31, 2007, a Party begins to dispose of disposition plutonium, such plutonium may count toward meeting the thirty-four (34) metric ton obligation set forth in paragraph 1 of Article II of this Agreement if:

   a) the criteria specified in the Annex on Technical Specifications are met; and

   b) monitoring and inspection measures agreed in writing by the Parties are applied to such disposition activities.


**Article V**

1. Promptly upon entry into force of this Agreement, the Parties shall undertake to develop a detailed action plan, including efforts with other countries as appropriate, to at least double the disposition rate specified in paragraphs 1 and 5 of Article IV of this Agreement at the earliest practicable date. The Parties shall seek to complete this detailed action plan within one year after entry into force of this Agreement. The development of the action plan and the development of arrangements provided for in paragraph 7 of Article IX of this Agreement will, for the Government of the United States of America and the Government of the Russian Federation, proceed in the channels that have negotiated this Agreement.

2. In developing the action plan pursuant to paragraph 1 of this Article, consideration may be given to:

   a) expanding the capability of existing nuclear reactors to utilize mixed uranium-plutonium fuel or using such fuel in additional nuclear reactors, including nuclear reactors outside the Russian Federation, and using such fuel or other plutonium fuel in

– 5 –

advanced nuclear reactors within the Russian Federation, if they prove practical in light of available resources within the time frame of this Agreement;

b) consistent with the expansion of capabilities mentioned in subparagraph (a) of this paragraph, increasing the capacity of conversion or conversion/blending facilities, fuel fabrication facilities and/or immobilization facilities, or constructing additional facilities; and

c) any other approaches as the Parties may agree.

3. Each Party shall proceed at the earliest possible date to dispose of disposition plutonium at the disposition rate specified in the action plan referred to in paragraph 1 of this Article if the assistance specified in the provisions supplementing the multilateral agreement referred to in paragraph 8 of Article IX of this Agreement for this rate in the Russian Federation is being provided.

## Article VI

1. Disposition plutonium and blend stock, once received at any disposition facility, shall not be:

a) used for the manufacture of nuclear weapons or any other nuclear explosive device, for research, development, design or testing related to such devices, or for any other military purpose; or

b) exported to a third country, including for disposition, except by agreement in writing of the Parties to this Agreement and subject to international safeguards and other applicable international agreements or arrangements, including INFCIRC/274/Rev. 1, The Convention on the Physical Protection of Nuclear Material.

2. Neither Party shall separate plutonium contained in spent plutonium fuel until such time as that Party has fulfilled the obligation set forth in paragraph 1 of Article II of this Agreement.

3. Neither Party shall separate disposition plutonium contained in immobilized forms.

4. Disposition facilities shall be utilized only in ways consistent with the terms and conditions of this Agreement.

5. Disposition plutonium and blend stock shall be the only plutonium received at or processed by disposition facilities that are conversion or conversion/blending facilities, or fuel fabrication facilities.

## Article VII

1. Each Party shall have the right to conduct and the obligation to receive and facilitate monitoring and inspection activities in accordance with this Article and the Annex on Monitoring and Inspections, which is an integral part of this Agreement, in order to confirm that the terms and conditions of this Agreement with respect to disposition

– 6 –

plutonium, blend stock, spent plutonium fuel and immobilized forms, and disposition facilities are being met.

2. Disposition plutonium and blend stock shall become subject to monitoring and inspection under this Agreement, in accordance with the Annex on Monitoring and Inspections and procedures developed pursuant to that Annex, either (a) after receipt but before processing at a conversion or conversion/blending facility, or (b) upon receipt at a fuel fabrication or an immobilization facility, whichever (a) or (b) occurs first for any given disposition plutonium or blend stock.

3. Each Party shall begin consultations with the International Atomic Energy Agency (IAEA) at an early date and undertake all other necessary steps to conclude appropriate agreements with the IAEA to allow it to implement verification measures beginning not later in the disposition process than: (a) when disposition plutonium or disposition plutonium mixed with blend stock is placed into the post-processing storage location of a conversion or conversion/blending facility; or (b) when disposition plutonium is received at a fuel fabrication or an immobilization facility, whichever (a) or (b) occurs first for any given disposition plutonium.

4. If agreed in writing by the Parties, the exercise of each Party's right set forth in paragraph 1 of this Article may be suspended in whole or in part by the application of equivalent IAEA verification measures under the agreements referred to in paragraph 3 of this Article. The Parties shall, to the extent practicable, avoid duplication of effort of monitoring and inspection activities implemented under this Agreement and appropriate agreements with the IAEA.

**Article VIII**

1. Each Party shall be responsible within the territory of the United States of America and the Russian Federation, respectively, for:

   a) ensuring safety and ecological soundness of disposition plutonium activities under the terms of this Agreement; and

   b) effectively controlling and accounting for disposition plutonium, blend stock, spent plutonium fuel and immobilized forms, as well as providing effective physical protection of such material and facilities containing such material taking into account the recommendations published in the IAEA document INFCIRC/225/Rev. 4, The Physical Protection of Nuclear Material, or a subsequent revision accepted by the Parties.

**Article IX**

1. The Government of the United States of America shall make available up to two hundred (200) million United States dollars in assistance for the activities to be undertaken in the Russian Federation pursuant to this Agreement and such other amounts as may be agreed in writing by the Parties for these purposes in the future, subject to the availability of appropriated funds and the fulfillment of United States legal and administrative requirements. Assistance provided by the Government of the United States of America shall be for such activities as the research, design, development, licensing, construction

– 7 –

and/or modification of facilities (including modification of nuclear reactors), and technological processes, systems and associated infrastructure for such activities. This assistance will be in addition to any other assistance that may be provided by the Government of the United States of America under the Scientific and Technical Cooperation Agreement.

2. Assistance provided by the Government of the United States of America may include research and development, scientific and technical experimentation, design for facility construction or modification, general and specialized equipment, replacement and spare parts, installation services, licensing and certification costs, initial operations and testing, aspects of facility operations, and other assistance directly related to the management and disposition of plutonium in accordance with the provisions of this Agreement.

3. Equipment, supplies, materials, services, and other assistance provided or acquired by the Government of the United States of America, its contractors, subcontractors, and their personnel, for the implementation of this Agreement in the Russian Federation, are considered free technical assistance.

4. Assistance provided by the Government of the United States of America for activities to be undertaken in the Russian Federation pursuant to this Agreement shall be provided in accordance with the terms and conditions set forth in this Agreement, including the Annex on Assistance, which is an integral part of this Agreement.

5. The activities of each Party under this Agreement shall be subject to the availability of appropriated funds.

6. Activities to be undertaken in the Russian Federation pursuant to this Agreement may be supported by contributions by the Government of the Russian Federation and by assistance provided by the Government of the United States of America and, as may be specified in the multilateral agreement referred to in paragraph 8 of this Article, by other countries or groups of countries (including equipment, supplies, materials, services, and other assistance provided by them). Activities may also be supported from other sources, including non-government and private sector funds, under terms and conditions agreed in writing by the Parties.

7. The Parties shall seek to develop near-term and long-term international financial or other arrangements for the support of activities to be undertaken in the Russian Federation pursuant to this Agreement sufficient, in combination with contributions by the Government of the Russian Federation and assistance provided by the Government of the United States of America, to achieve and maintain:

   a) the two (2) metric ton per year disposition rate specified in paragraphs 1 and 5 of Article IV of this Agreement; and

   b) the disposition rate resulting from the action plan developed pursuant to paragraph 1 of Article V of this Agreement.

8. For the disposition rate referred to in paragraph 7(a) of this Article, the Parties shall cooperate with a view toward concluding within one (1) year after entry into force of this Agreement a multilateral agreement that documents the assistance arrangements necessary for that rate. For the disposition rate resulting from the action plan developed pursuant to paragraph 1 of Article V of this Agreement, the Parties shall cooperate with a view to

– 8 –

supplementing such multilateral agreement with provisions recording assistance arrangements necessary for that rate.

9. As part of the multilateral agreement referred to in paragraph 8 of this Article, the Parties shall seek to provide for:

   a) notifications, explanations and immediate consultations in the event that a recorded assistance commitment is not fulfilled; and

   b) those consultations to include consideration of resumption of assistance, measures to mitigate any consequences of such non-fulfillment, including costs associated with nuclear safety, physical protection and facility conservation, and other measures as deemed appropriate by the participants in the consultations.

10. If conclusion of the multilateral agreement referred to in paragraph 8 of this Article for assistance arrangements necessary for the disposition rate set forth in paragraph 7(a) of this Article is not completed within eighteen (18) months after entry into force of this Agreement for any reason, the Parties shall consult on whether to adjust the schedules for their respective programs, including any necessary adjustments to the milestones set forth in the Annex on Schedules and Milestones, and any other steps, or whether to terminate the Agreement in accordance with Article XIII of this Agreement.

11. Pending conclusion of the multilateral agreement referred to in paragraph 8 of this Article and conclusion of necessary arrangements with the Government of the Russian Federation for the disposition rate set forth in paragraph 7(a) of this Article, neither Party shall be obligated to construct, modify or operate facilities to dispose of disposition plutonium pursuant to this Agreement. Notwithstanding this, each Party shall proceed under this Agreement with activities in accordance with paragraph 3 of Article IV of this Agreement necessary for construction, modification or operation of disposition facilities.

12. If one or more parties to the multilateral agreement referred to in paragraph 8 of this Article decide to terminate implementation of their assistance commitments recorded in that agreement, and as a result the Government of the Russian Federation is unable to fulfill its obligations with respect to the achievement of a milestone set forth in the Annex on Schedules and Milestones or of the annual disposition rate specified in paragraphs 1 and 5 of Article IV or paragraph 3 of Article V of this Agreement, whichever is applicable, the Government of the Russian Federation shall have the right, consistent with the requirements of paragraphs 13 and 15 of this Article, to suspend those implementation activities under this Agreement that are affected by such termination.

13. If the Government of the Russian Federation intends to exercise its right pursuant to paragraph 12 of this Article, it shall notify the Government of the United States of America through diplomatic channels at least fourteen (14) days prior to any such suspension of implementation activities and identify what activities are to be suspended, and the Parties shall immediately start consultations. In the event implementation of the recorded assistance commitments referred to in paragraph 12 of this Article is not resumed within one hundred and eighty (180) days after the start of consultations, the Parties will consider whether to resume implementation of or to terminate the Agreement in accordance with Article XIII of this Agreement.

14. In the event the Government of the Russian Federation suspends any implementation activities pursuant to paragraph 12 of this Article, the Government of the United States of

– 9 –

America shall have the right to suspend proportionately its implementation activities under this Agreement.

15. During the consultations referred to in paragraph 13 of this Article, unless otherwise agreed by the Parties in writing, neither Party shall take any action that:

a) could break the continuity in the other Party's knowledge of disposition plutonium or disposition facilities, that had become subject to monitoring and inspection under this Agreement, in a manner that would prevent that Party from confirming that such disposition plutonium or disposition facilities are not being used in ways inconsistent with the Agreement; or

b) would be inconsistent with the terms and conditions for assistance that had been provided under this Agreement.

**Article X**

1. Under this Agreement, no United States classified information or Russian Federation state secret information shall be exchanged, except as may be agreed in writing by the Parties for purposes of exchanging information pursuant to this Agreement related to the quantities and locations of disposition plutonium and blend stock at disposition facilities.

2. The information transmitted under this Agreement or developed as a result of its implementation and considered by the United States of America as "sensitive" or by the Russian Federation as "konfidentsial'naya" must be clearly designated and marked as such.

3. "Konfidentsial'naya" or "sensitive" information shall be handled in accordance with the laws of the state of the Party receiving the information, and this information shall not be disclosed and shall not be transmitted to a third party not participating in the implementation of this Agreement without the written consent of the Party that had transmitted such information.

a) According to the laws and regulations of the Russian Federation, such information shall be treated as "limited-distribution official information." Such information shall be protected in accordance with the laws and regulations of the Russian Federation.

b) According to the laws and regulations of the United States of America, such information shall be treated as "foreign government information," provided in confidence. Such information shall be protected in accordance with the laws and regulations of the United States of America.

4. Information transmitted under this Agreement shall be used solely in conformance with this Agreement.

5. The Parties shall minimize the number of persons having access to information that is designated "konfidentsial'naya" or "sensitive" information in accordance with paragraph 2 of this Article.

– 10 –

6. The Parties shall ensure effective protection and allocation of rights to intellectual property, transferred or created under this Agreement, as set forth in this Agreement, including the Annex on Intellectual Property, which is an integral part of this Agreement.

## Article XI

1. The Parties shall designate Executive Agents for implementation of this Agreement. The Executive Agent for the United States of America shall be the U.S. Department of Energy. The Executive Agent for the Russian Federation shall be the Ministry of the Russian Federation for Atomic Energy.

2. With the exception of the notification referred to in paragraph 1 of Article XIII of this Agreement, notifications between the Parties that are provided for by this Agreement shall be transmitted between the Executive Agents unless otherwise specified.

3. The Executive Agents may enter into implementing agreements and arrangements as necessary and appropriate to carry out the provisions of this Agreement. When appropriate, the Executive Agents may utilize other agencies or entities to assist in the implementation of this Agreement, such as government agencies, academies, universities, science and research centers, institutes and institutions, and private sector firms.

## Article XII

1. The Parties shall establish a Joint Consultative Commission for this Agreement to:

   a) consider and resolve questions regarding the interpretation or application of this Agreement;

   b) consider additional measures as may be necessary to improve the viability and effectiveness of this Agreement; and

   c) consider and resolve such other matters as the Parties may agree are within the scope of this Agreement.

2. The Joint Consultative Commission shall meet within twenty-one (21) days of a request of either Party or its Executive Agent.

3. Each Party shall designate its Co-Chairman to the Joint Consultative Commission. Each Party shall notify the other Party of its designated Co-Chairman in writing within thirty (30) days after entry into force of this Agreement. Decisions of the Joint Consultative Commission shall be made on the basis of consensus.

## Article XIII

1. This Agreement shall be applied provisionally from the date of signature and shall enter into force on the date of the last written notification that the Parties have fulfilled the national procedures required for its entry into force.

– 11 –

2. This Agreement may only be amended by written agreement of the Parties, except that the Annex on Schedules and Milestones may be updated as specified in Section II of that Annex.

3. Except as provided in paragraph 4 of this Article, this Agreement shall terminate on the date the Parties exchange notes confirming that thirty-four (34) metric tons of disposition plutonium have been disposed by each Party in accordance with this Agreement, unless terminated earlier by written agreement of the Parties.

4. If additional quantities of weapon-grade plutonium are brought under this Agreement pursuant to paragraph 5 of Article II of this Agreement, this Agreement shall terminate on the date the Parties exchange notes confirming that thirty-four (34) metric tons of disposition plutonium and all such additional quantities of weapon-grade plutonium have been disposed in accordance with this Agreement, unless terminated earlier by written agreement of the Parties.

5. Notwithstanding termination of this Agreement in accordance with paragraph 3 or 4 of this Article:

   a) neither Party shall use plutonium, once it is received at any disposition facility, for the manufacture of nuclear weapons or any other nuclear explosive device, for research, development, design or testing related to such devices, or for any other military purpose;

   b) neither Party shall export to a third country plutonium, once it is received at any disposition facility, except by agreement in writing of the Government of the United States of America and the Government of the Russian Federation and subject to international safeguards and other applicable international agreements or arrangements, including INFCIRC/274/Rev. 1, The Convention on the Physical Protection of Nuclear Material;

   c) neither Party shall (i) use any plutonium separated from spent plutonium fuel for the manufacture of nuclear weapons or any other nuclear explosive device, for research, development, design or testing related to such devices, or for any other military purpose, or (ii) export spent plutonium fuel, immobilized forms, or any plutonium separated from spent plutonium fuel to a third country, except by agreement in writing of the Government of the United States of America and the Government of the Russian Federation and subject to international safeguards and other applicable international agreements or arrangements, including INFCIRC/274/Rev. 1, The Convention on the Physical Protection of Nuclear Material;

   d) each Party shall continue to effectively control and account for spent plutonium fuel and immobilized forms, as well as to provide effective physical protection of such material taking into account the recommendations published in the IAEA document INFCIRC/225/Rev. 4, The Physical Protection of Nuclear Material, or subsequent revisions accepted by the Parties;

   e) the obligations set forth in paragraph 3 of Article VI of this Agreement, Article X of this Agreement, paragraphs 6 and 7 of this Article, paragraphs 5, 6, and 7 of the General Assistance Section of the Annex on Assistance, and the Liability Section of the Annex on Assistance shall remain in force unless otherwise agreed in writing by

– 12 –

the Government of the United States of America and the Government of the Russian Federation;

f) the Parties shall consult concerning implementation of existing contracts and projects between the Parties and settlement of any outstanding costs between the Parties; and

g) for any activities under this Agreement and any importation or exportation by the Government of the United States of America, its personnel, contractors and contractors' personnel of equipment, supplies, materials or services that had been required to implement this Agreement, no retroactive taxes shall be imposed in the Russian Federation.

6. At an appropriate early date, but in any event not fewer than five (5) years prior to termination of this Agreement, the Parties shall begin consultations to determine what international monitoring measures shall be applied, after termination, to spent plutonium fuel, immobilized forms, and disposition facilities that are conversion or conversion/blending facilities or fuel fabrication facilities, as well as to any reprocessing of spent plutonium fuel. In the event the Parties do not reach agreement on such monitoring measures prior to the termination of this Agreement, each Party shall:

a) make such fuel and forms available for inspection by the other Party under established procedures, if the other Party has a question or concern regarding changes in their location or condition; and

b) unless it can be demonstrated that such facilities have been decommissioned and can no longer be operated, make such facilities available for inspection by the other Party under established procedures, if the other Party has a question or concern regarding the use of such facilities.

7. No spent plutonium fuel shall be reprocessed by either Party after termination of this Agreement unless such reprocessing is subject to monitoring agreed by the Parties pursuant to paragraph 6 of this Article.

8. Nothing in this Agreement shall alter the rights and obligations of the Parties under the Scientific and Technical Cooperation Agreement.

DONE at _____ and _____, the ___ and ___ days of _____, 2000, in duplicate in the English and Russian languages, both texts being equally authentic.

FOR THE GOVERNMENT OF THE                FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:                RUSSIAN FEDERATION:

## List of Annexes

Annex on Quantities, Forms, Locations, and Methods of Disposition
Annex on Technical Specifications
Annex on Schedules and Milestones
Annex on Monitoring and Inspections
Annex on Assistance
Annex on Intellectual Property

**ANNEX**
**ON**
**QUANTITIES, FORMS, LOCATIONS, AND METHODS OF DISPOSITION**

This Annex to the Agreement Between the Government of the United States of America and the Government of the Russian Federation Concerning the Management and Disposition of Plutonium Designated as No Longer Required for Defense Purposes and Related Cooperation, hereinafter referred to as the Agreement, sets forth each Party's declaration of disposition plutonium.

### Section I -- Quantities and Methods of Disposition

For the United States of America:

| Quantity (metric tons) | Form | Method of Disposition |
|---|---|---|
| 25.00 | Pits and Clean Metal | Irradiation |
| 0.57 | Oxide | Irradiation |
| 2.70 | Impure Metal | Immobilization |
| 5.73 | Oxide | Immobilization |

For the Russian Federation:

| Quantity (metric tons) | Form | Method of Disposition |
|---|---|---|
| 25.00 | Pits and Clean Metal | Irradiation |
| 9.00 | Oxide | Irradiation |

### Section II -- Forms

1.  Pits and Clean Metal: plutonium in or from weapon components or weapon parts, and plutonium metal prepared for fabrication into weapon parts.

2.  Impure Metal: plutonium alloyed with one or more other elements in the form of a homogeneous metal, and unalloyed plutonium metal that is not clean metal.

3.  Oxide: plutonium in the form of plutonium dioxide.

– 2 –

### Section III -- Locations

The Government of the United States of America declares that:

1) all the "pits and clean metal" it declared in Section I of this Annex will be shipped to the Pit Disassembly and Conversion Facility in the United States of America directly from Zones 4 or 12 of the Pantex Plant in Texas, Technical Area 55 at the Los Alamos National Laboratory in New Mexico (LANL TA-55), the Plutonium Finishing Plant complex at 200 West Area the Hanford Site in Washington (Hanford PFP), the Plutonium Building at Lawrence Livermore National Laboratory in California (LLNL Plutonium Building), and the F and K areas at the Savannah River Site in South Carolina (Savannah River F and K Areas);

2) all the "oxide" it declared in Section I of this Annex to be irradiated in reactors as mixed uranium-plutonium fuel will be shipped to its fuel fabrication facility in the United States of America directly from LANL TA-55, LLNL Plutonium Building, and Savannah River F and K Areas;

3) all the "impure metal" it declared in Section I of this Annex will be shipped directly to its immobilization facility in the United States of America from LANL TA-55, Savannah River F and K Areas, Hanford PFP, and LLNL Plutonium Building; and

4) all the "oxide" it declared in Section I of this Annex to be immobilized will be shipped directly to its immobilization facility in the United States of America from LANL TA-55, LLNL Plutonium Building, Savannah River F and K Areas, and Hanford PFP.

The Government of the Russian Federation declares that:

1) all the "pits and clean metal" it declared in Section I of this Annex will be shipped to the conversion/blending facility in the Russian Federation under the Agreement directly from the Fissile Material Storage Facility at Mayak being constructed under the Agreement between the Department of Defense of the United States of America and the Ministry of the Russian Federation for Atomic Energy Concerning the Provision of Material, Services, and Training Relating to the Construction of a Safe, Secure and Ecologically Sound Storage Facility for Fissile Material Derived from the Destruction of Nuclear Weapons of September 2, 1993; and

2) all the "oxide" it declared in Section I of this Annex will be shipped directly to the conversion/blending facility in the Russian Federation from the places where such oxide was stored pursuant to the Agreement Between the Government of the United States of America and the Government of the Russian Federation Concerning Cooperation Regarding Plutonium Production Reactors, of September 23, 1997.

ANNEX
ON
TECHNICAL SPECIFICATIONS

This Annex to the Agreement Between the Government of the United States of America and the Government of the Russian Federation Concerning the Management and Disposition of Plutonium Designated as No Longer Required for Defense Purposes and Related Cooperation, hereinafter referred to as the Agreement, sets forth the criteria for determining that disposition plutonium is disposed.

### Section I -- Light Water Reactors

Disposition plutonium irradiated under the Agreement in light water reactors shall be considered disposed when the resulting spent plutonium fuel meets the following criteria:

1. Each spent plutonium fuel assembly contains a unique identifier that demonstrates it to be a fuel assembly produced with disposition plutonium;

2. Each spent plutonium fuel assembly is irradiated to a fuel burn-up level of no less than 20,000 megawatt days thermal per metric ton of heavy metal; and

3. The radiation level from each spent plutonium fuel assembly is such that it will become no less than 1 sievert per hour one meter from the accessible surface at the centerline of the assembly 30 years after irradiation has been completed.

### Section II -- Immobilization

Disposition plutonium in immobilized forms shall be considered disposed when the system meets the following criteria:

1. Each can containing disposition plutonium immobilized in a glass or ceramic form designated to be inserted into a canister is marked with a unique identifier that allows for confirming the presence of the can as it is inserted into the canister;

2. Each canister containing cans of disposition plutonium is marked with a unique identifier that allows it to be identified during and after the immobilization process;

3. Each canister does not contain more than 30 kilograms of disposition plutonium; and

4. The radiation level from each canister is such that it will become no less than 1 sievert per hour one meter from the accessible surface at the centerline of the canister 30 years after the canister has been filled with high-level radioactive waste.

### Section III -- BN-600 Reactor

Disposition plutonium irradiated under the Agreement in the BN-600 reactor shall be considered disposed when the resulting spent plutonium fuel meets the following criteria:

– 2 –

1. Each spent plutonium fuel assembly contains a unique identifier that demonstrates it to be a fuel assembly produced with disposition plutonium;

2. Each spent plutonium fuel assembly is irradiated to an average fuel burn-up level of no less than nine (9) percent of heavy atoms, unless the Parties agree in writing for safety reasons to a lower average level; and

3. The radiation level from each spent plutonium fuel assembly is such that it will become no less than 1 sievert per hour one meter from the accessible surface at the centerline of the assembly 30 years after irradiation has been completed.

**ANNEX**
**ON**
**SCHEDULES AND MILESTONES**

This Annex to the Agreement Between the Government of the United States of America and the Government of the Russian Federation Concerning the Management and Disposition of Plutonium Designated as No Longer Required for Defense Purposes and Related Cooperation, hereinafter referred to as the Agreement, sets forth schedules and milestones for each Party.

**Section I -- Schedules and Milestones**

For the program of the United States of America:

| Date | Milestone |
|---|---|
| January 2002 | Completion of the design of the Pit Disassembly and Conversion Facility |
| March 2002 | Completion of the design of the mixed uranium oxide-plutonium oxide (MOX) Fuel Fabrication Facility |
| March 2002 | Start of excavation for the Pit Disassembly and Conversion Facility |
| July 2003 | Start of excavation for the Immobilization Facility |
| October 2003 | Start of excavation for the MOX Fuel Fabrication Facility |
| June 2004 | Completion of the design of the Immobilization Facility |
| March 2005 | Completion of construction of the Pit Disassembly and Conversion Facility |
| March 2006 | Start of industrial-scale operations of the Pit Disassembly and Conversion Facility |
| April 2006 | Completion of construction of the MOX Fuel Fabrication Facility |
| December 2006 | Completion of construction of the Immobilization Facility |
| March 2007 | Start of operations of the MOX Fuel Fabrication Facility |
| September 2007 | Start of MOX Reactor operations/Irradiation of first batch of MOX in Reactor |
| March 2008 | Start of full-scale production-operations of Immobilization Facility |

For the program of the Russian Federation:

| Date | Milestone |
|---|---|
| January 2002 | Completion of modification of the State-Scientific-Center Experimental-Research-Complex Research Institute of Atomic Reactors (OIK GNTs RIAR) for fabrication of VIPAC fuel for BN-600 (hybrid core) |

– 2 –

| October 2002 | Completion of the test-fuel line for fabrication of initial VVER-1000 lead-test MOX assemblies (3 MOX LTAs) |
|---|---|
| January 2003 | Completion of modification of the PAKET facility for fabrication of BN-600 pellet fuel (hybrid core) |
| January 2003 | Completion of the Demonstration Conversion Facility (for weapon-grade plutonium to oxide) |
| July 2003 | Start construction of industrial-scale Conversion Facility |
| July 2003 | Start construction of industrial-scale MOX fuel Fabrication Facility |
| April 2004 | Begin transition of BN-600 to a MOX hybrid core |
| April 2004 | Fabrication of initial VVER-1000 MOX lead-test assemblies |
| August 2004 | Completion of the design of industrial-scale Conversion Facility |
| October 2004 | Completion of the design of industrial-scale MOX Fuel Fabrication Facility |
| July 2006 | Completion of construction of industrial-scale Conversion Facility |
| July 2006 | Start of operation of industrial-scale Conversion Facility |
| December 2007 | Completion of construction of industrial-scale MOX Fuel Fabrication Facility |
| December 2007 | Start of operation of industrial-scale MOX Fuel Fabrication Facility |
| October 2007 | Decision on BN-600 life-extension |
| 2008 | Fabrication of an industrial batch of VVER-1000 MOX-fuel |
| 2009 | Beginning of operations of storage facility for BN-600 spent plutonium fuel |

## Section II -- Notification of Updates

1. Each Party shall update as necessary the information it has provided in Section I of this Annex in accordance with the following:

    a) the updating Party's Executive Agent shall notify the Executive Agent of the other Party in writing with explanation of the reason for such an update; and

    b) the updating Party's Executive Agent shall provide such notification in writing not later than 90 days after the associated change occurs.

## Section III -- Completion Criteria

The Executive Agents will develop an agreed set of completion criteria for the milestones set forth in this Annex by not later than six (6) months after the signature of the Agreement.

**ANNEX**
**ON**
**MONITORING AND INSPECTIONS**

This Annex sets forth principles and provisions to govern the development of procedures for, and the implementation of, monitoring and inspection activities pursuant to Article VII of the Agreement Between the Government of the United States of America and the Government of the Russian Federation Concerning the Management and Disposition of Plutonium Designated as No Longer Required for Defense Purposes and Related Cooperation, hereinafter referred to as the Agreement.

### Section I -- Definitions

For purposes of the Agreement, the following definitions shall apply:

1.  "Monitoring" means a set of measures and activities, including inspections, use of special equipment, and review of documents (records and reports), that together provide data to the monitoring Party on disposition plutonium, blend stock, spent plutonium fuel, immobilized forms, or disposition facilities.

2.  "Inspection" means a monitoring activity conducted by the monitoring Party on-site at a facility in order to obtain data and make observations on disposition plutonium, blend stock, spent plutonium fuel, immobilized forms, or disposition facilities.

### Section II -- General Principles

1.  *Scope*:  Monitoring and inspection activities shall be conducted in accordance with the Agreement, this Annex, and procedures to be agreed by the Parties pursuant to Section V of this Annex.

2.  *Purpose*:  In accordance with paragraph 1 of Article VII of the Agreement, monitoring and inspection activities shall be designed and implemented to ensure that the monitoring Party has the ability independently to confirm that the terms and conditions of the Agreement with respect to disposition plutonium, blend stock, spent plutonium fuel, immobilized forms, and disposition facilities are being met, specifically:  paragraphs 1, 6 and 7 of Article II; paragraph 2 of Article III; Article VI; and paragraph 2 of Article VII of the Agreement.

3.  *Systems of Control and Accounting*:  The Parties shall implement national systems of control and accounting for nuclear materials to account for and keep records of disposition plutonium, blend stock, spent plutonium fuel, and immobilized forms.  Operators of disposition facilities shall use this national system of control and accounting in order to prepare agreed data to be included in their reports.  Such reports shall be provided to the monitoring Party according to procedures to be developed pursuant to Sections III and V of this Annex.

4.  *Inspections*:  The number, intensity, duration and timing of inspections, and the intensity of other monitoring activities, shall be kept to the minimum consistent with the effective

– 2 –

implementation of agreed monitoring activities pursuant to the Agreement and this Annex. Procedures for monitoring shall be designed so as to minimize, to the extent possible, interference with the operation of facilities, and to avoid affecting their nuclear safety or the safety of inspectors. Specific inspection procedures shall be developed pursuant to Section V of this Annex.

5.  Inspectors shall be permitted access to disposition facilities sufficient for them to be able to attain the agreed goals of the inspection, using agreed procedures designed to avoid disclosure of United States classified information and Russian Federation state secret information in accordance with the provisions of paragraph 1 of Article X of the Agreement. The monitored Party shall take every necessary measure, in accordance with agreed procedures, to ensure the access of the monitoring Party's inspectors to those facilities, and shall undertake to provide all necessary conditions for successful inspection implementation.

6.  Each Party shall treat with due respect the inspectors of the other Party present on its territory in connection with monitoring activities under the Agreement and shall take all appropriate measures, consistent with its national law, to prevent any attack on the person, freedom and dignity of such personnel.

7.  Each Party, in accordance with agreed procedures, shall facilitate the procurement of required services and use of equipment, the entry and exit of personnel of the other Party into and out of its territory, and the import into and export from its territory of materials and equipment for carrying out monitoring and inspection activities in accordance with the Agreement including this Annex.

8.  *Relationship to Other Monitoring Regimes*: For disposition plutonium that comes from a facility subject to another U.S.-Russian bilateral monitoring regime, or an international monitoring regime that has been agreed by the Parties, monitoring under the Agreement shall take into account that other monitoring regime, and shall not conflict with the transfer requirements of that other monitoring regime. In developing monitoring and inspection procedures in accordance with the Agreement, the Parties should avoid duplicating the efforts of such other monitoring regimes.

9.  *Pu-240/Pu-239 Ratio*: The monitoring Party shall be allowed to confirm, using an agreed method, that the Pu-240/Pu-239 ratio of the disposition plutonium is no greater than 0.10. Confirmation of this ratio shall occur after receipt but before processing of disposition plutonium at a conversion facility, or upon receipt at a fuel fabrication facility or immobilization facility, whichever occurs first for any given disposition plutonium.

10. *Protection of Information*: Measurements on plutonium, if required to protect United States classified information or Russian Federation state secret information from disclosure, shall be made by techniques using information barriers. Such measurements shall not be required, however, for any disposition plutonium in containers for which such measurements:

    a)  had already been made under another agreement accepted by the monitoring Party; and

    b)  are confirmed by the monitoring Party to remain valid.

– 3 –

11. *Blend Stock Measurements*:  The monitoring Party shall have the right to confirm that the mass of any blend stock does not exceed what is allowed pursuant to paragraphs 6 and 7 of Article II of the Agreement, upon receipt of such blend stock at a disposition facility, using agreed procedures developed pursuant to Section V of this Annex.  Information concerning the composition of the blend stock shall not be provided to, or obtained by, the monitoring Party.

12. *Procedures at Specific Facilities*:  Each Party shall provide and update as appropriate a list of its disposition facilities as their specific locations are determined.  The monitoring Party shall have the right to conduct monitoring activities, including inspections and other measures, at disposition facilities.  These measures shall provide continuity of knowledge of disposition plutonium and blend stock necessary for the monitoring Party to determine whether the objectives of the Agreement are being met.

13. Pursuant to paragraph 1 of Article X of the Agreement, inspectors shall not have access to any parameters that are United States classified information or Russian Federation state secret information because of their relationship to nuclear weapon design or manufacturing.

14. *Conversion Product*:  The blended or unblended plutonium-oxide at the post-processing storage location within a conversion or conversion/blending facility (hereinafter referred to as the "conversion product") shall have no characteristics that are considered classified by the United States of America or state secret by the Russian Federation.

15. The monitoring Party shall have the right to confirm the mass and relevant isotopic composition of the conversion product (even if it contains United States "sensitive" information or Russian Federation "konfidentsial'naya" information), using agreed measurement procedures, without the application of "yes/no" techniques or information barriers.

16. *Design Information*:  For the purpose of developing agreed measures pursuant to Section V of this Annex, the Parties shall identify an agreed set of design information to be provided to the monitoring Party for disposition facilities.  Once the set of design information is identified, that information shall be provided to the monitoring Party at an agreed time.  The monitoring Party shall be allowed access to disposition facilities before operations and thereafter, as necessary to confirm design information, using agreed procedures.

17. *Unexpected Circumstances*:  Procedures developed pursuant to Section V of this Annex shall include provisions, including monitoring activities as appropriate,  concerning unexpected technical circumstances.

## Section III -- Records and Reports

1. Based on its national system of control and accounting, each Party shall periodically submit to the other Party reports that were agreed upon in accordance with Section V of this Annex.  Such reports shall at a minimum contain information on the quantity of plutonium at each disposition facility, as well as the quantities of plutonium received or shipped from that facility (including the plutonium in spent plutonium fuel, but not that in other spent fuel).

– 4 –

2. The Parties shall develop agreed methods of recording for disposition plutonium, blend stock, spent plutonium fuel, and immobilized forms, and the formats of reports to the monitoring Party on disposition activities.

### Section IV -- General Approach to Confirm Disposition of Disposition Plutonium

1. The monitoring Party shall have the right, using agreed procedures, to confirm that spent plutonium fuel assemblies and immobilized forms meet the criteria specified in the Annex on Technical Specifications.

2. Monitoring rights on spent plutonium fuel and immobilized forms shall include procedures, designed with a view to minimize costs, that will allow confirmation that such fuel and forms remain in their declared locations.

### Section V -- Development of Specific Procedures and Administrative Arrangements

1. The Parties shall seek to complete by December 2002 an agreed set of detailed measures, procedures, and administrative arrangements, consistent with the terms of the Agreement (including this Annex), for monitoring and inspections of disposition plutonium, blend stock, spent plutonium fuel, immobilized forms, and disposition facilities. This set of detailed measures, procedures, and administrative arrangements shall be completed in writing prior to beginning construction of industrial-scale disposition facilities in the Russian Federation. The development of these measures, procedures, and administrative arrangements shall be coordinated at an early stage with, and be made compatible with, the design effort for the disposition facilities.

2. Procedures agreed pursuant to paragraph 1 of this Section shall specify, among other things, the rights and responsibilities of the facility personnel and inspectors, types of and content of reports, how measurements are to be done, and how independent conclusions are to be arrived at, including, among other things, appropriate procedures for applying containment and surveillance measures, and technical goals for monitoring, with a view to minimizing costs. These agreed procedures shall include, but not be limited to, measures to:

   a) provide assurance that at all times prior to completion of the disposition of the thirty-four (34) metric tons of disposition plutonium under the Agreement: (i) conversion product resulting from the blending of those thirty-four (34) metric tons with the allowed additional quantity of blend stock under the Agreement is the only plutonium that enters disposition facilities that are fuel fabrication facilities in the United States of America and the Russian Federation; and (ii) all plutonium (including the plutonium in spent plutonium fuel, but not that in other spent fuel) entering or leaving disposition facilities does so in accordance with the Agreement, appropriately taking into account waste, as necessary;

   b) confirm the fulfillment of the criteria specified in the Annex on Technical Specifications; and

   c) allow each Party to distinguish spent plutonium fuel from other spent fuel that may be located in the same storage area.

**ANNEX**
**ON**
**ASSISTANCE**

This Annex to the Agreement between the Government of the United States of America and the Government of the Russian Federation Concerning the Management and Disposition of Plutonium Designated as No Longer Required for Defense Purposes and Related Cooperation, hereinafter referred to as the Agreement, sets forth the agreed procedures and provisions to govern assistance provided by the Government of the United States of America for the activities to be undertaken in the Russian Federation as provided for in Article IX of the Agreement.

### Section I -- General Assistance Provisions

1. The steps and estimated funding levels for assistance provided by the Government of the United States of America are set forth in the attachment to this Annex. The estimated allocation in that attachment may be revised and updated as the Executive Agents may agree in writing.

2. All equipment, supplies, materials or other assistance provided under the Agreement shall be delivered to mutually-agreed points of entry, unless otherwise agreed in writing. The provider of such equipment, supplies, materials or other assistance shall notify the recipient of the planned date of arrival and point of entry in advance. The recipient shall take possession of all such equipment, supplies, materials and other assistance upon its arrival at the point of entry, unless otherwise agreed in writing.

3. Title to all equipment and facilities provided under the Agreement to, and accepted by, the Government of the Russian Federation, or entities under its jurisdiction or control, shall pass to the Government of the Russian Federation or entities under its jurisdiction or control unless agreed otherwise in writing by the Parties.

4. Equipment, supplies, materials, services, technology or other assistance provided under the Agreement shall be utilized only in accordance with the terms and purposes of the Agreement.

5. Equipment, supplies, materials, services, technology, or other assistance provided under the Agreement shall not be used for the production of nuclear weapons or any other nuclear explosive device, for research or development, design or testing related to such devices, or for any other military purpose.

6. Equipment, supplies, materials, services, technology, or other assistance provided under the Agreement, or developed with assistance provided under the Agreement, shall not be exported, re-exported, or transferred from the jurisdiction of the recipient without the written consent of the Parties.

7. Prior to the export to a third party of any equipment, supplies, materials, services, technology, or other assistance provided under the Agreement, the Parties by mutual agreement in writing shall define the conditions in accordance with which such items will be exported, re-exported, or transferred from the jurisdiction of the third party.

– 2 –

8. The Government of the Russian Federation notes that the Government of the United States of America intends to seek accreditation, as administrative and technical staff of the Embassy of the United States of America in Moscow, of United States Government personnel present in the territory of the Russian Federation on a regular basis for activities related to assistance provided under the Agreement, and hereby confirms that the Government of the Russian Federation will accredit such personnel.  Upon entry into force of the Agreement, the Parties will consult on the overall number of United States Government assistance-related personnel envisioned for activities under the Agreement. Each Party shall treat with due respect the unaccredited personnel of the other Party present on its territory in connection with activities related to assistance under the Agreement and shall take all appropriate measures, consistent with its national law, to prevent any attack on the person, freedom and dignity of such personnel.

9. Each Party shall facilitate the movement of persons and the transfer of currencies as necessary for implementation of the Agreement.

10. Facilities in the Russian Federation that have been constructed or modified using assistance provided under the Agreement shall be used only for mutually-agreed purposes.

11. A Party, its Executive Agent, or other agents authorized to act on behalf of a Party or its Executive Agent, that awards contracts for the acquisition of articles and services, including construction, research and development, licensing, design, or other activities to implement the Agreement, shall select suppliers or contractors in accordance with the laws and regulations of that Party.

12. The Executive Agents shall establish and maintain a register of equipment, supplies, materials, services, technology and other assistance subject to the provisions of this Annex.

### Section II -- Liability

1. The Parties shall continue negotiations on liability provisions to apply to all claims that may arise from activities undertaken pursuant to the Agreement and shall seek to conclude an agreement in writing containing such provisions at the earliest practicable date, and, in any event, not later than entry into force of the multilateral agreement referred to in paragraph 8 of Article IX of the Agreement.

2. Until entry into force of the agreement containing liability provisions referred to in paragraph 1 of this Section:

   a) assistance activities under the Agreement shall be limited to appropriate pre-construction design work;

   b) neither Party shall be obligated under the Agreement to construct, modify, or operate disposition facilities, including reactors; and

   c) the Russian Federation shall not utilize in any way the pre-construction design work conducted under the Agreement including for the construction, modification, or operation of disposition facilities (including reactors).

– 3 –

## Section III -- Taxation of Assistance

1. The Government of the United States of America, its personnel, contractors and contractors' personnel shall not be liable to pay any tax or similar charge by the Russian Federation or any of its instrumentalities on activities undertaken in accordance with this Agreement. The provisions of this paragraph shall not exempt any contractor's personnel who are nationals of or permanently resident in the Russian Federation, and are present in the Russian Federation in connection with such activities, from income, social security, or any other taxes imposed by the Russian Federation, or by any instrumentalities thereof, regarding income received in connection with the implementation of programs of assistance provided by the Government of the United States of America.

2. The Government of the United States of America, its personnel, contractors, and contractors' personnel may import into, and export out of, the Russian Federation any equipment, supplies, materials or services required to implement this Agreement. Such importation and exportation shall be exempt from any license fees, restrictions, customs duties, taxes or any other charges by the Russian Federation or any of its instrumentalities, but not from the procedures called for by the export control system.

## Section IV -- Audits and Examinations

1. Upon request, representatives of the Government of the United States of America shall have the right to examine the use of any equipment, supplies, materials, training or other services provided under the Agreement, if possible at sites of their location or use, and shall have the right to inspect any and all related records or documentation during the period of the Agreement and for three (3) years thereafter.

2. Appropriate arrangements in support of the conducting of audits and examinations shall be developed by the Executive Agents. The right to conduct the audits and examinations set forth in paragraph 1 of this Section shall not be contingent upon the development of these arrangements.

## Section V -- Equipment Certification

1. The Executive Agent or designated agent of the Government of the Russian Federation shall examine all equipment, supplies, and other materials in each shipment received pursuant to this Agreement and within ten (10) days of receipt shall provide written confirmation to the Executive Agent of the Government of the United States of America, its designated agent or contractor of acceptance or rejection based on whether the equipment, supplies, or other materials conform to specifications mutually coordinated in advance for said equipment, supplies or other materials. Upon request, one or more representatives of the Government of the United States of America or its designated agent may be present at the examination of the equipment, supplies, materials, or other assistance being delivered. Basic certification procedures shall be agreed in writing by the Executive Agents.

**Attachment to Annex on Assistance**

Provision of assistance in accordance with paragraph 1 of Article IX of the Agreement will begin in calendar year 2000 and will continue thereafter to support disposition of disposition plutonium of the Russian Federation, in accordance with the steps and quantities below. Development of the disposition process will continue to be funded under the Scientific and Technological Cooperation Agreement.

| Purpose | Funding Level | Time Frame |
|---|---|---|
| Design of Industrial-scale Facilities | Up to U.S.$70 Million | 2000-2003 |
| Construction of Industrial-scale Facilities | Up to U.S.$130 Million plus future appropriations including non-U.S. sources | 2003-2007 |
| Operation of Industrial-scale Facilities | Future appropriations including non-U.S. sources | 2007 and onward |

## ANNEX
## ON
## INTELLECTUAL PROPERTY

This Annex to the Agreement between the Government of the United States of America and the Government of the Russian Federation Concerning the Management and Disposition of Plutonium Designated as No Longer Required for Defense Purposes and Related Cooperation, hereinafter referred to as the Agreement, sets forth the procedures governing the protection and allocation of rights to intellectual property transferred or created under the Agreement.

The Parties shall ensure adequate and effective protection of intellectual property created or furnished under this Agreement. The Parties agree to notify one another in a timely fashion of all intellectual property created and results of scientific and technical work obtained under this Agreement and to seek protection for such intellectual property in a timely fashion. Rights to such intellectual property shall be allocated in keeping with the provisions of this Annex.

### Section I -- Definitions

1. The term "intellectual property" shall have the meaning found in Article 2 of the Convention Establishing the World Intellectual Property Organization, which was signed in Stockholm on July 14, 1967.

2. The term "participants" shall mean natural persons or legal entities participating in joint activities within the framework of implementation of the Agreement.

3. The term "background intellectual property" shall mean intellectual property created outside the Agreement and belonging to the participants, the use of which is necessary for the implementation of activities under the Agreement.

### Section II -- Scope

1. This Annex is applicable to all cooperative activities undertaken pursuant to the Agreement, except as otherwise agreed by the Parties or their Executive Agents.

2. This Annex addresses the allocation of intellectual property rights and takes into consideration the interests of the Parties.

3. Each Party shall ensure that the other Party can obtain the rights to intellectual property allocated in accordance with this Annex. If necessary, each Party shall obtain those rights from its own participants through contracts, license agreements or other legal documents. This Annex does not in any other way alter or prejudice the allocation of rights between a Party and its participants.

4. Disputes concerning intellectual property arising under the Agreement shall be resolved through discussions between the participants, or, if necessary, the Parties or their Executive Agents, which may for these purposes utilize the Joint Consultative Commission. Upon mutual agreement of the Parties or participants, a dispute shall be

– 2 –

submitted to an arbitral tribunal for binding arbitration in accordance with the Agreement and the applicable rules of international law.  Unless the Parties or their designees agree otherwise in writing, the arbitration rules of UNCITRAL shall govern.

### Section III -- Allocation of Rights

1.  Each Party, its Executive Agent or other authorized representative designated by a Party shall be entitled to a nonexclusive, irrevocable, royalty-free license for non-commercial purposes in all countries to translate, reproduce, and publicly distribute scientific and technical journal articles, papers, reports, and books directly resulting from cooperation under this Agreement.  All publicly distributed copies of a copyrighted work prepared under this provision shall indicate the names of the authors of the work unless an author explicitly expresses the desire to remain anonymous.

2.  Rights to all forms of intellectual property created under the Agreement, other than those rights set forth in paragraph 1 of this Section, shall be allocated as follows:

    a)  For intellectual property created during joint research, for example, if the Parties or their participants have agreed in advance on the scope of work, each Party, its Executive Agent or other authorized representative designated by a Party shall be entitled to all rights and interests in its own country.  Rights and interests in third countries shall be determined in implementing agreements, taking into consideration the following factors, as appropriate:

        1)  the nature of the cooperation,

        2)  the contributions of each of the Parties and its participants to the work to be performed, including background intellectual property,

        3)  the intentions, capabilities, and obligations of each of the Parties and its participants to provide legal protection of intellectual property created, and

        4)  the manner in which the Parties and their participants will provide for the commercialization of intellectual property created, including, where appropriate and possible, joint participation in commercialization.

        In addition, each person named as an inventor or author shall be entitled to receive rewards in accordance with the policies of each Party's participating institution.

    b)  Visiting researchers not involved in joint research, for example, scientists visiting primarily in furtherance of their education, shall receive intellectual property rights under arrangements with their host institutions.  In addition, each such visiting researcher shall be entitled to receive rewards in accordance with the policies of the host institution.

    c)  In the event either Party believes that a particular joint research project under the Agreement will lead, or has led, to the creation or furnishing of intellectual property of a type that is not protected by the applicable laws of the United States of America or the Russian Federation, the Parties shall immediately hold consultations to determine the allocation of the rights to the said intellectual property.  Such joint activities shall be suspended during the consultations unless otherwise agreed to by the Parties.  If no

– 3 –

agreement can be reached within a three-month period from the date of the request for consultations, the Parties shall cease the cooperation under the project in question.

3. Rights to background intellectual property may be transferred by the Parties and their participants through license agreements between individuals and/or legal entities. Such license agreements may reflect the following:

   a) definitions,

   b) identification of intellectual property being licensed and the scope of the license,

   c) royalty rates and other compensation,

   d) requirements for protection of business-confidential information,

   e) requirements to comply with the relevant intellectual property and export control laws of the United States of America and the Russian Federation,

   f) procedures for record keeping and reporting,

   g) procedures for dispute resolution and termination of each agreement, and

   h) other appropriate terms and conditions.

### Section IV -- Business-Confidential Information

In the event that information identified in a timely fashion as business-confidential is furnished or created under the Agreement, each Party and its participants shall protect such information in accordance with applicable laws, regulations, and administrative practices. Information may be identified as "business-confidential" if a person having the information may derive an economic benefit from it or may obtain a competitive advantage over those who do not have it, if the information is not generally known or publicly available from other sources, and if the owner has not previously made the information available without imposing in a timely manner an obligation to keep it confidential. Neither Party nor its participants shall publish or transfer to third parties business-confidential information furnished or created under the Agreement without the prior written consent of the other Party or its participants.

JOINT STATEMENT
CONCERNING NON-SEPARATION OF WEAPON-GRADE PLUTONIUM
IN CONNECTION WITH
THE AGREEMENT BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE RUSSIAN FEDERATION
CONCERNING THE MANAGEMENT AND DISPOSITION OF PLUTONIUM
DESIGNATED AS NO LONGER REQUIRED FOR DEFENSE PURPOSES AND
RELATED COOPERATION

The Government of the United States of America and the Government of the Russian Federation, hereinafter referred to as the Parties, have already taken significant steps toward ending the production of fissile material for use in nuclear weapons. These steps include the signing of the Agreement Between the Government of the United States of America and the Government of the Russian Federation Concerning Cooperation Regarding Plutonium Production Reactors (PPRA) of September 23, 1997, concerning the cessation of the generation of weapon-grade plutonium at United States and Russian plutonium production reactors.

One of the key objectives of the Agreement Between the Government of the United States of America and the Government of the Russian Federation Concerning the Management and Disposition of Plutonium Designated as No Longer Required for Defense Purposes and Related Cooperation, hereinafter referred to as the Agreement, is to reduce irreversibly stockpiles of weapon-grade plutonium from each side's nuclear weapons programs. Both Parties recognize that this disposition will require significant resources. Both Parties also recognize that it would make little sense for either side to commit significant financial and other resources to dispose of such plutonium if either side were planning to continue to separate and accumulate new weapon-grade plutonium.

In this light:

- The Parties reaffirm their intentions not to produce any new weapon-grade plutonium, including by reprocessing of spent fuel or by any other technological process, for nuclear weapons or other nuclear explosive devices or for any military purposes.

- The Government of the United States of America also reaffirms its intention not to separate any new weapon-grade plutonium by any means for any other purposes.

- The Government of the Russian Federation also reaffirms its intention not to build up any stockpile of newly separated weapon-grade plutonium for civil purposes and not to produce any newly separated weapon-grade plutonium unless and until justified for civil power production purposes. In the event that spent fuel containing weapon-grade plutonium were to be reprocessed in the future, the Government of the Russian Federation will take all necessary measures to ensure that any such reprocessing and its products are as proliferation-resistant as possible. The Government of the Russian Federation also confirms its intention to ensure that separation of any plutonium through reprocessing or other technological processes will be keyed to the demand in the civil sector, so as to ensure no unnecessary build up of any civil plutonium stockpiles.

– 2 –

- The Parties note that, during the duration of the Agreement, the BN-600 blanket will be removed in stages to achieve its maximum reduction as quickly as possible, consistent with safety considerations, and that all fuel used in that reactor will not be reprocessed during the duration of the Agreement. After termination of the Agreement, any reprocessing of BN-600 spent fuel containing weapon-grade plutonium resulting from irradiation during the duration of the Agreement will be subject to international monitoring under agreed procedures.

- The Parties note their intention to intensify consultations concerning possible cooperation outside the Agreement on immobilization technologies, including immobilization of waste products containing weapon-grade plutonium, to develop alternatives to separation of such plutonium in the Russian Federation.

- The Parties affirm that, if any of these intentions should change in the future, the Parties will consult in advance of such change, for the purpose of reaching new understandings and agreeing on appropriate measures.

The Parties understand the term "reprocessing" to have its internationally agreed definition, that is, the "separation of irradiated nuclear material and fission products," and note that cleaning up existing separated weapon-grade plutonium to remove Am-241, minor alloying elements, or other impurities, does not constitute reprocessing or new production.

The Parties also note that this Joint Statement of intentions does not:

(1) affect the ongoing separation activities related to weapon-grade plutonium for small-scale research and development or clean-up efforts, or efforts to address urgent environmental or safety hazards, involving small numbers of kilograms; or

(2) alter or affect ongoing separation activities related to weapon-grade plutonium generated by the three plutonium production reactors still operating at Seversk and Zheleznogorsk prior to their being converted under the PPRA, provided that all such plutonium is subject to monitoring in accordance with that agreement.

FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF THE
RUSSIAN FEDERATION:

_____

_____

_____, 2000

_____, 2000



SECRETARY OF STATE
F I L E D
JUN 1 4 2002
AM                    PM
7 8 9 10 11 12 1 2 3 4 5 6

# State of South Carolina

## Executive Department



## Office of the Governor

**EXECUTIVE ORDER NO.**

### 2002-14

**WHEREAS**, according to U.S. Attorney General John Ashcroft, a "known terrorist" with connections to al Qaeda who allegedly planned to build and explode a radioactive "dirty bomb" in the United States has been recently captured by federal authorities and is presently being detained as an enemy combatant in Charleston, South Carolina;

**WHEREAS**, a "dirty bomb" is a conventional incendiary device laced with radioactive materials that upon detonation scatters and disperses radioactive particles into the atmosphere, thereby exposing potentially thousands of persons to radiation;

**WHEREAS**, weapons-grade plutonium is a primary ingredient utilized in creating dirty bombs;

**WHEREAS**, the United States Department of Energy has publicly announced that it will begin sending truck shipments of weapons-grade plutonium to the Savannah River Site located in Aiken and Barnwell Counties, South Carolina as soon as June 15, 2002;

**WHEREAS**, when, in the Governor's opinion, a danger exists to the person or property of any citizen and the peace and tranquility of the State or of any political subdivision or particular area of the State designated by him is threatened, the Governor shall declare an emergency and may take such measures and do all and every act and thing which he may deem necessary in order to prevent violence or threats of violence to the person or property of citizens of the State and to maintain peace, tranquility and good order, pursuant to § 1-3-410 of the South Carolina Code of Laws;

CERTIFIED TO BE A TRUE AND CORRECT COPY
AS TAKEN FROM AND COMPARED WITH THE
ORIGINAL ON FILE IN THIS OFFICE

JUN 1 7 2002

SECRETARY OF STATE OF SOUTH CAROLINA

**WHEREAS**, the Governor may further cope with such threats and danger by directing and ordering any person or group of persons to do any act which would, in his opinion, prevent or minimize danger to life, limb or property, or prevent a breach of the peace; and he may order any person or group of persons to refrain from doing any act or thing which would, in his opinion, endanger life, limb or property, or cause, or tend to cause, a breach of the peace, or endanger the peace and good order of the State or any section or community thereof, and he shall have full power by use of all appropriate available means to enforce such order or proclamation, pursuant to § 1-3-430;

**WHEREAS**, for the purposes already stated, the Governor may also order any and all law enforcement officers of the State or any of its subdivisions to do whatever may be deemed necessary to maintain peace and good order; order the discontinuance of any transportation or other public facilities, or, in the alternative, direct that such facilities be operated by a State agency; or authorize, order or direct any State, county or city official to enforce the provisions of such proclamation in the courts of the State by injunction, mandamus, or other appropriate legal action, pursuant to § 1-3-440; and

**WHEREAS**, a legitimate threat of theft, diversion, or use of plutonium by terrorists exists that requires serious protective measures to prevent the terrorist use of plutonium in South Carolina and to protect the citizens of South Carolina from the threat and effect of dirty bombs or other related terrorist devices;

**THEREFORE**, I hereby declare that an emergency exists and order that the transportation of plutonium on South Carolina roads and highways is prohibited; that any persons transporting plutonium shall not enter the State of South Carolina; and that any persons nevertheless attempting or intending to transport plutonium along the public thoroughfares of the State of South Carolina shall give notice of such intention and to cease and desist from such action until further direction is given.

I further order and direct the South Carolina Department of Public Safety to increase and enhance its security, patrol, inspection, and surveillance measures along South Carolina's highways, particularly in the areas along our state's borders and surrounding the Savannah River Site; and to enforce the provisions of this Executive Order.

**GIVEN UNDER MY HAND AND THE GREAT SEAL OF THE STATE OF SOUTH CAROLINA, THIS 14th DAY OF June, 2002.**

**JIM HODGES**

Attest:

**SECRETARY OF STATE**



# State of South Carolina
## Office of the Governor

Jim Hodges
Governor

Post Office Box 11829
Columbia 29211

**For Immediate Release**
**Friday, June 14, 2002**

**CONTACT:**
**Morton Brilliant or**
**Cortney Owings, (803) 734-9411**

## Governor Hodges Signs Executive Order, Declares State of Emergency over Plutonium Shipments

**Columbia, S.C.** – Governor Jim Hodges today issued an executive order prohibiting the transportation of plutonium on South Carolina roads and highways. Citing concerns over the danger existing to persons and property, Governor Hodges declared a state of emergency and decreed that the transportation of plutonium on South Carolina roads and highways is prohibited. The South Carolina Department of Public Safety is preparing to implement the Governor's executive order.

A full copy of the Governor's statement and executive order follows.

**(Attachments - Governor's statement and executive order)**

**-More-**



## GOVERNOR HODGES' STATEMENT ON PLUTONIUM EXECUTIVE ORDER

Thank you all for being here on such short notice.

The Department of Energy has made its intentions clear. They plan to ship plutonium over our highways and into our state. According to the Attorney General of the United States and the Director of Homeland Security, this radioactive material is coveted by terrorists for a "dirty bomb." One of these terrorists is sitting in the Charleston naval brig at this very moment.

The Department of Energy has broken promises, offered no assurances, and left few options. Once plutonium arrives, it will never leave. They want South Carolina to quietly become the nation's plutonium dumping ground. This plutonium will be stored indefinitely in buildings not intended for storage, and processed in a facility that will likely never be built. Any accident would potentially cause great damage to our state.

These actions by the Department of Energy pose an immediate hazard, and threaten the long term health and safety of our state. As Governor, when I believe that a danger exists to our state, I am empowered to declare an emergency, and take measures necessary to maintain peace and safety.

For these reasons, I have today issued an executive order declaring that an emergency exists.

I order that the transportation of plutonium on South Carolina roads and highways is prohibited.

I order that any persons transporting plutonium shall not enter the State of South Carolina.

And I order that any persons attempting or intending to transport plutonium through our state must give notice of such intention, and cease and desist such action until further direction is given.

I further order and direct the South Carolina Department of Safety to increase its security, patrol, inspection and surveillance measures along South Carolina's highways, particularly in the areas along our state's borders and surrounding the Savannah River Site, and to enforce the provisions of this executive order.

I know the folks in Washington will not like this action. And we will follow any court order regarding the shipment of this plutonium. But until ordered otherwise, I will continue to exercise any and every lawful power I possess to keep this plutonium from threatening the safety of our citizens.

Thank you for coming here today.

###